UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CYNTHIA BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

Case No. 4:12-CV-468 (CEJ)

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On July 11, 2008,[1] plaintiff Cynthia Brown filed an application for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, with an alleged onset date of May 23, 2008.[2] (Tr. 126-133). After plaintiff's application was denied on initial consideration (Tr. 77-81), she requested a hearing from an Administrative Law Judge (ALJ). See Tr. 85-92 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on November 12, 2009 (Tr. 30-74). The ALJ issued a decision on August 5, 2010 denying plaintiff's application (Tr. 10-24), and the Appeals Council denied plaintiff's request for review on January 24, 2012. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1] The ALJ Decision states that July 3, 2008 was the date plaintiff filed her Title II application. (Tr. 10). The Application Summary for Disability Insurance Benefits reflects July 11, 2008 as the date of filing. (Tr. 126-133).

[2] Plaintiff amended her alleged onset date to July 1, 2008. (Tr. 10).

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In her Disability Report (Tr. 149-168), plaintiff listed her disabling conditions as osteoarthritis, bulging disk lower back, intracranial hypertension, depression, double knee surgery, and stasis dermatitis. She stated that she has difficulty standing, walking, sitting, lifting, getting up from a seated position, and climbing stairs or curbs. She explained that she had trouble concentrating at work and missed many days as a result of the pain and swelling. She wrote that every two to three weeks she suffers from a flare-up that prevents her from being able to walk for "days." She stated that her depression is mostly stable, but has sensed herself "slipping some." Plaintiff listed past employment as dental assistant.

In her Function Report (Tr. 182-192), plaintiff stated that her daily activities include watching television, working on puzzles, reading, shopping for groceries once a week for no longer than an hour, minimal housework, and making dinner a couple times per week. She wrote that she cares for her children by making meals and helping them with their homework. However, she stated that her husband and children "help with everything" and "do most things for themselves." She claims she is no longer able to do laundry, housework, or yardwork, but can fold clothes, do dishes, drive a car, pay bills, handle a savings account, count change, and use a checkbook. She states that it is painful for her to put pants on, that it is difficult for her to get on and off the toilet, and that she does not shower often because it wears her out. She claims that her pain fluctuates in intensity and that some days she needs to rest after walking four steps.

### B.  Hearing on November 12, 2009

-2-

At the time of the hearing, plaintiff was 39 years old, married, and lived in a house with her husband, 16-year-old son, and 12-year-old daughter. (Tr. 36-38). Plaintiff asserted that she was 5'4" tall and weighed 300 pounds. (Tr. 38). Plaintiff is a high school graduate who testified that she has no trouble performing simple arithmetic, writing, or using a computer. (Tr. 38-39).

Plaintiff stated that she had been a dental assistant for twenty years at various offices and that she last worked on May 23, 2008 as a "general chair side dental assistant." (Tr. 42-43). In this role plaintiff was qualified to place dental fillings, take permanent impressions for dental appliances, and place retraction cords around gum tissue. (Tr. 43-44). Her supervisor also required her to do housekeeping tasks. (Tr. 47-48). Plaintiff further testified to working in a retail store from 1994 to 1995, where she stocked items, hung clothes, assisted ladies with dressing, and performed minimal cashier work. (Tr. 46).

Plaintiff testified that she chooses to use a cane when in public, but sometimes opts for a walker or wheelchair. She stated that she has osteoarthritis, which causes her to have pain, weakness, and diminished strength in her knees. (Tr. 50). She testified to undergoing surgery on both knees in August 2007 with no improvement and denied receiving any recommendations about weight loss from her treating physicians. (Tr. 50-51, 55). Plaintiff further asserted that she experiences pain in her hips and back, has been seeing a pain management doctor, and is taking Percocet.[3] (Tr. 51). She also stated that she suffers from depression and anxiety and that she

---

[3] Percocet is a combination of oxycodone and acetaminophen.  Ocycodone is an opioid analgesic for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

sees a psychiatrist. She believed Cymbalta[4] helps decrease the depression. She also claimed to suffer from episodes of headaches, occurring every month or two, that can last up to two weeks and cause her to be "non-functioning." Plaintiff treats the headaches with over-the-counter Advil. (Tr. 54-55, 66).

Plaintiff testified that she no longer feels that she can engage in the same activities that she originally listed in her Disability and Function Reports. She explained that she now spends 50 percent of her day lying down, no longer provides much help with her children's homework or with grocery shopping, and has stopped doing laundry and dishes. (Tr. 56). She does not vacuum or perform any yard work. (Tr. 59). However, she stated that she continues to drive once or twice a week and cooks simple meals. (Tr. 57-59). She further asserted that she cannot stand or walk for more than five minutes, cannot sit for more than 30 minutes, and does not lift anything heavier than a gallon of milk. (Tr. 59-60). She explained that she has side effects from her medications, which include sleepiness, constipation, irritability, dizziness, and headaches. (Tr. 57).

Plaintiff testified that walking, standing, bending, stooping, and sitting aggravate her knee pain and that her medications only tend to "take the edge off." (Tr. 61-62). She testified to swelling in her lower extremities that she attributes to walking or standing and that requires her to elevate her legs on a daily basis. (Tr. 62-63). Plaintiff explained that her depression has made her a "homebody" in that she does not want to be around many people and that she is typically irritable. (Tr. 65-66).

_____

[4] Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

Delores E. Gonzalez, a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities.  (Tr. 67-74). The ALJ asked Ms. Gonzalez to list plaintiff's vocational history and classify each position. Ms. Gonzalez listed dental assistant as light, semi-skilled; office cleaner as heavy, unskilled; and retail sales clerk as light, semi-skilled. (Tr. 69).

The ALJ asked about the available employment opportunities for an individual with plaintiff's education, training, and work experience, requiring a light limitation on exertion, a sit stand option, and the ability to change positions frequently, who can climb stairs and ramps occasionally, can stoop, kneel, and crouch occasionally, and who cannot climb ropes, ladders, or scaffolds or crawl. (Tr. 69-70). Ms. Gonzalez opined that such an individual would be unable to perform plaintiff's past employment, but could work as a cashier (of which there are 81,800 jobs within the state of Missouri) or a ticket taker (of which there are 2,930 jobs within the state of Missouri). (Tr. 70).

The ALJ then asked about the available employment opportunities for an individual with the same skills and abilities as in the prior hypothetical, but with a sedentary limitation instead of a light limitation. Ms. Gonzalez testified that such an individual would be able to work as an information clerk (of which there are 17,640 jobs within the state of Missouri), call out operator (of which there are 1,190 jobs within the state of Missouri), and surveillance system monitor (of which there are 2,020 jobs within the state of Missouri). (Tr. 70-71).

The ALJ then asked about the available employment opportunities for an individual with the same skills, abilities, and limitations as the second hypothetical, but with an added requirement that includes the employer providing two additional breaks,

-5-

in conjunction with the two normally provided breaks, and a one-hour lunch. The individual would also require three days off every two weeks. Ms. Gonzalez testified that such an individual would be unable to perform any of the jobs previously listed. (Tr. 71).

After the ALJ concluded his questioning, plaintiff's attorney asked Ms. Gonzalez whether an individual who requires rest for four hours out of an eight-hour period would be able to hold any of the jobs previously listed. Ms. Gonzalez testified that such an individual would be unable to maintain employment at a competitive rate. Plaintiff's attorney then asked whether an individual who has no useful ability to deal with work stresses and who has a seriously limited ability to deal with the public, use judgment, interact with supervisors, function independently, and maintain attention and concentration would be able to hold any of the jobs previously listed. Ms. Gonzalez answered in the negative. (Tr. 72).

### C.  Medical Evidence

On May 18, 2007, plaintiff saw Jennifer C. Carpenter, M.D. with complaints of knee pain. AP, lateral, and tunnel views were obtained on the left knee, which revealed no fracture, dislocation or abnormal bone production. (Tr. 295-297). On May 23, 2007, plaintiff went to the Orthopedic Center of St. Louis to see Mark D. Miller, M.D. Plaintiff reported that she had been suffering from bilateral knee pain for 10 to 15 years with intermittent swelling. Dr. Miller wrote that plaintiff did not seem to be in distress, was ambulating without a noticeable antalgic gait, and that her range of motion was within normal limits in both knees. He also noted mild crepitus. (Tr. 344-345). Dr. Miller ordered an MRI of the right knee which revealed a small horizontal tear in the body of the medial meniscus, small cartilaginous erosions in the medial compartment, and

patellar articulation. (Tr. 231). On May 31 and August 8, 2007, plaintiff returned to Dr. Miller to discuss the options of "living with [the pain] versus injection protocols versus diagnostic arthroscopy." Plaintiff elected surgery. (Tr. 340-343).

On August 24, 2007, Dr. Miller performed bilateral knee arthoscopic evaluations. In both left and right knees, Dr. Miller successfully completed a partial medial meniscectomy, a partial lateral meniscectomy, a chondroplasty of the medial demoral condyle and lateral facet patella, a syncovectomy, and an arthoscopic lateral release. (Tr. 234-239). Plaintiff returned to Dr. Miller for a two-week post operative visit on September 6, 2007. Plaintiff stated that her right knee was "doing very well," but she was struggling with the left. Dr. Miller wrote that plaintiff's "knees [were] actually doing relatively well" and that he was "pleased with the lack of swelling and range of motion." (Tr. 339). On October 4, 2007, plaintiff had a six-week post operative visit in which Dr. Miller wrote that she was progressing as expected, was undergoing some arthritic changes in both knees that would likely lead to some residual symptoms, and that he was optimistic that she would be able to return to work in two weeks. (Tr. 338).

Progress notes from plaintiff's physical therapist, Rebecca DeMargel, reflect that she attended all scheduled appointments except for one. (Tr. 381-388). On October 17, 2007, plaintiff reported that her knees had significantly improved over the prior two weeks and that the intensity of her pain at rest was a 0 out of 10 and "stiff and achy" at worst. Ms. DeMargel wrote that plaintiff demonstrated "significantly improved functional mobility and strength," but that the left knee weakness and pain with functional activities remained. (Tr. 383, 388). On the same date plaintiff also returned to Dr. Miller's office. Dr. Miller wrote that he was "pleased with the outcome" of the surgery and felt "like the vast majority of her preoperative pain [was] resolved." Dr.

-7-

Miller also noted that he discussed weight loss with plaintiff and that such an action would be the "best option." (Tr. 337). Plaintiff was again counseled about weight loss on February 8, 2008 by Dr. Carpenter who recommended that she engage in sustained exercise for at least 30 minutes 3 to 4 times a week. (Tr. 300).

On February 14, 2008, plaintiff underwent an ankle screen that revealed no evidence of deep vein thrombosis of the bilateral lower extremity veins. (Tr. 288-289). On February 20, 2008, plaintiff visited with Dr. Carpenter who prescribed her hydrocodone and ultram for pain, discussed leg elevation and hose use, and again counseled her on weight loss and exercise. (Tr. 308-309). On March 21, 2008, plaintiff saw Dr. Carpenter for another appointment. Progress notes reflect that her knee pain and medications remained same and that she was instructed to pay attention to her diet. (Tr. 310-311).

On March 28, 2008, plaintiff went to the St. Louis Vascular Center to discuss her bilateral lower extremity edema and venous stasis dermatitis. Plaintiff was given a prescription for surgical stockings and was told to wear them daily. (Tr. 319-320). On April 4, 2008, plaintiff underwent a venous color duplex scan in which all results came back normal except for mild superficial venous incompetency of the right lower extremity. (Tr. 322).

Plaintiff had her first consultation with Hugh Berry, M.D. at Pain Management Services on May 30, 2008. Dr. Berry diagnosed her with osteoarthritis of the knees and gave her trials of Lidoderm patches, Volaren gel, and Flector patches for the pain. He wrote that she might require epidural steroid injections for her back pain despite her reports of minimal problems. Dr. Berry also wrote that plaintiff did not suffer from

-8-

fibromyalgia, but that her pain was likely a result of generalized spondylosis and arthritis. (Tr. 360-363).

On June 4, 2008, plaintiff returned to Dr. Miller with complaints of escalated pain and swelling, which she claimed developed after she returned to work. She stated that her job required her to stand for 40 to 60 hours per week. Dr. Miller advised her to continue seeing Dr. Berry for pain management and discussed the possibility of viscosupplementation as a form of treatment.[5] (Tr. 335-336).

On June 27, 2008, plaintiff returned to Dr. Berry and reported that her pain had improved since her last visit. Plaintiff attributed her improvement to both a change in her employment that required minimal weight bearing on her knees and her participation in a pool exercise program. Dr. Berry reported that she had improved range of motion of the left knee and much less tenderness. (Tr. 364-365).

On July 9, 2008, physical therapist John Teepe[6] reported in a letter to Dr. Miller that plaintiff exhibited functional range of motion and improved functional strength. Mr. Teepe also relayed plaintiff's comments that the stretching exercises helped her feel better and that she felt stronger with the strengthening exercises. However, he noted that she did not exhibit very good tolerance for the progression of her functional exercises. (Tr. 371).

---

[5] Viscosupplementation injects hyaluronic acid into the knee joint and acts as a lubricant to enable bones to move smoothly over each other. This procedure is a therapeutic option for individuals with osteoarthritis of the knee. American Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=a00217 (last visited Nov. 29, 2012).

[6] John Teepe replaced Rebecca DeMargel as plaintiff's primary physical therapist. (Tr. 371).

-9-

On July 10, 2008, plaintiff had an initial consultation with Raziya Mallya, M.D. at the St. Louis Behavioral Medicine Institute. Plaintiff stated that she "felt she had to establish [a] relationship with a psychiatrist for her future need." Dr. Mallya reported that plaintiff had depressive disorder with a GAF of 60.[7] Plaintiff was currently taking Wellbutrin[8] but they discussed the possibility of switching her to Cymbalta.[9] Plaintiff saw Dr. Mallya one month later on August 7, 2008. Treatment notes state that plaintiff's "moods [were] fairly stable." (Tr. 519).

On August 9, 2008, plaintiff sought treatment at the Emergency Department at St. Luke's Hospital for gait difficulty and an inability to ambulate. Plaintiff stated that she had "twisted her left knee" while walking one week earlier. A four-view x-ray reflected mild osteoarthritis with no evidence of a fracture, dislocation or destructive bone lesion.  (Tr. 434-440).

On August 11, 2008, plaintiff returned to Dr. Miller. Contrary to the August 9 hospital records which reflect that she "twisted her left knee," Dr. Miller's report states that plaintiff was "simply walking" with "no twist, no falls, nothing," just "an immediate

---

[7] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning.  Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).  A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Id. at 34.

[8] Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder.  See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

[9] Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274/ (last visited Nov. 26, 2012).

onset of pain." Dr. Miller observed that plaintiff came into the office in a wheelchair, but was sitting on the examination table when he entered the room. He wrote that she did not appear to be in discomfort, had full terminal extension with perhaps 5 degrees of loss, no effusion, and she could flex at least to 108 degrees without discomfort. Dr. Miller further wrote that the "amount of pain that she [was] having fairly dramatically exceeds the operative findings" and as a result did not recommend any additional imaging studies or surgery. (Tr. 462-463).

On August 21, 2008, Suzanne Page, a medical consultant, filled out an RFC assessment regarding plaintiff. The evaluation reflects the opinion that plaintiff can occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of at least 2 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; never balance; occasionally kneel, crouch, crawl, climb ramps, stairs, ladders, ropes, or scaffolds; and frequently stoop. Ms. Page did not indicate any manipulative, visual, communicative, or environmental limitations and described plaintiff's statements as "partially credible." (Tr. 413-418).

On the same day plaintiff also underwent a psychiatric review by Dr. Judith McGee, who reported that her depressive disorder was not a severe impairment. Dr. McGee indicated on a checklist form that plaintiff had mild restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 419, 427).

On September 2, 2008, plaintiff returned to Dr. Mallya regarding her depression and "reported some improvement" and that she was "feeling more relaxed." (Tr. 519).

On September 30, 2008, plaintiff again reported that she was "feeling much better." (Tr. 519).

On September 24, 2008, plaintiff received her first of three vicosupplementation injections from Dr. Miller. Two days later plaintiff visited with Dr. Berry, in which she reported that her pain was better and that her medication provided her with 25% relief, but that she suffered from sleepiness as a side effect. Dr. Miller wrote that plaintiff had minimal pain with lumbar flexion and extension, minimal pain of the knees, minimal effusion on the right knee, that plaintiff was obtaining good results from the Cymbalta as it was minimizing much of her generalized pain, and that there was no evidence of oversedation. Dr. Miller included fibromyalgia as a diagnosis.[10] (Tr. 490-491).

Dr. Miller administered a second set of vicosupplementation injections on October 1, 2008, and plaintiff reported improvement from the first set. (Tr. 460). The final injections were administered on October 8, 2008 and plaintiff again reported improvement in her symptoms and that she no longer required the use of a cane or a crutch. (Tr. 459). On November 19, 2008, plaintiff visited with Dr. Berry and stated that her pain was better and that her medications provided her with 65% relief. Dr. Berry noted continued positive results from Cymbalta and that she was doing quite well in tapering off opiates. (Tr. 492-493).

On January 8, 2009, plaintiff visited Dr. Mallya. Progress notes state that plaintiff's "mood [was] stable." (Tr. 520). On February 27, 2009, plaintiff visited Dr. Berry and stated that her pain was worse. However, she also stated that her medication provided her with 75% relief, that she felt as if the relief was near

---

[10] The record contains no diagnosis of fibromyalgia made by a rheumatologist.

complete, and that she did not experience any side effects. Plaintiff also reported increased activity, such as participation in water aerobics and cycling, and her intention to continue improving her activity level. (Tr. 494-495).

On March 5, 2009, plaintiff reported to Dr. Mallya that she had "been feeling quite well" and that she "enjoy[ed] water aerobics." However on March 11, 2009, plaintiff stated that she was feeling more depressed. In response, Dr. Mallya increased her dosage of Cymbalta. (Tr. 520).

On April 24, 2009, plaintiff told Dr. Berry that her pain was worse, that she felt as if her medications provided her with only 50% relief, and that her knees occasionally gave out. (Tr. 496-497). On June 1, 2009, plaintiff sought treatment at the Emergency Department at St. John's Mercy Medical Center for low back and buttock pain, which she claimed she had been experiencing for a week. An MRI of the lumbar spine revealed L5-S1 degenerative signal within the L5-S1 disc, but no protrusion, canal or neural foraminal compromise; L5-S1 facet degeneration; and transitional S1 segment. A seven-view image of the lumbar spine revealed normal results. Plaintiff was prescribed Valium for muscle spasms and was given a Dilaudid injection for pain. (Tr. 469-486).

On June 4, 2009, plaintiff returned to Dr. Berry. Plaintiff reported her pain to be worse and that her medication provided her with only 50% relief along with side effects of sleepiness, nausea, and constipation. Plaintiff explained that she had been sitting on the floor for several hours and that when she got up she had severe pain radiating down her legs. (Tr. 499). A June 22, 2009 MRI remained unchanged from the prior MRI and the lumbar spine x-ray was normal. (Tr. 500-501).

On June 30, 2009, plaintiff underwent an electrodiagnostic evaluation by Lizette Alvarez, M.D. at the request of Dr. Berry. Dr. Alvarez's physical examination revealed plaintiff to be a "pleasant woman in no acute distress," with mild ankle edema, soft, non-tender calves, range of motion within functional limits, and normal strength in the lower extremities. The electrodiagnostic study was normal and not suggestive of any neuropathy or radiculopathy. (Tr. 487-488). At a follow up appointment with Dr. Berry on July 10, 2009, plaintiff rated her pain as "much better."

On August 27, 2009, plaintiff followed up with Dr. Mallya and reported "some improvement with [the increased dose of] Cymbalta." During this visit, Dr. Mallya slightly increased the dosage a second time, which plaintiff later stated helped her with the depressive symptoms. (Tr. 521, 523).

On August 28, 2009, Susan Colburn, a nurse practioner for Dr. Carpenter, completed an assessment for plaintiff's disability claim. Hypertension, fibromyalgia, and joint pain were listed as plaintiff's diagnosis. The assessment noted that plaintiff's endurance would be affected by her impairments and that her employment should be limited to seated work with 30- to 40-minute rest periods since her pain would limit the amount of seated time she could sustain. (Tr. 517).

Dr. Mallya also completed an assessment for plaintiff's disability claim, which listed depressive disorder with lack of interest as the diagnosis. Dr. Mallya expressed the opinion that plaintiff's disorder would affect to the "full extent" her ability to engage in sustained full-time competitive employment. Yet, despite this assessment, Dr. Mallya rated plaintiff's ability to follow work rules, relate to co-workers, maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social

situations as good.[11] She further rated plaintiff's ability to deal with the public, use judgment, interact with supervisors, function independently, concentrate, and demonstrate reliability as fair.[12] She felt that plaintiff would be poor at dealing with work stresses.[13] (Tr. 514-515).

On October 29, 2009, plaintiff had a consultation at the St. Louis Neurological Institute due to an onset of headaches. (Tr. 533-534). Robert Margolis, M.D. ordered an MRI of the brain which yielded normal results. (Tr. 525). On October 30, 2009, plaintiff visited with Dr. Miller complaining of generalized and new hip pain, but denied any significant side effects from any of her medication. Dr. Miller's diagnosis was degeneration of lumbar or lumbosacral intervertebral disc. (Tr. 525-526). On November 5, 2009, plaintiff returned to Dr. Margolis for a follow up. Progress notes state that plaintiff no longer suffered from headaches and there was no deterioration in her vision or her vision fields.

On January 28, 2010, Alan Morris, M.D. performed an orthopedic evaluation and completed a medical assessment questionnaire. Included in the assessment was Dr. Morris's opinion that plaintiff can occasionally lift a maximum of 10 pounds, cannot carry any amount of weight, can stand or walk for no more than 30 minutes total in an eight-hour work day, can sit for no more than 2 hours total in an eight-hour work day, and can never climb stairs, ramps, ladders, or scaffolds, and never balance, stoop, kneel, crouch, or crawl. (Tr. 537-546).

---

[11] "Good - Ability to function in this area is limited but satisfactory."

[12] "Fair - Ability to function in this area is seriously limited, but not precluded."

[13] "Poor or None - No useful ability to function in this area."

On the same day, Dianna Moses-Nunley, Ph.D, performed a psychological evaluation on plaintiff. Dr. Moses-Nunley stated that she had no concerns about plaintiff's reliability and described her as alert, pleasant, and calm. The report noted "chronic maladjustment that manifests primarily as a mood disorder and is likely related to the onset, severity, and course of her pain disorders." Plaintiff was given a GAF of 70.[14] The evaluation further reflected that plaintiff would have the ability to interact appropriately with the public, supervisors, and co-workers with moderate restrictions in responding appropriately to usual work situations and to changes in routine work setting. (Tr. 550-559).

On February 22, 2010, plaintiff returned to Dr. Berry stating that her pain was worse but that her medications provided 80% relief, which was the highest estimation since she began pain management. Dr. Berry wrote that her medications were an effective form of treatment. (Tr. 610-611). Another MRI of the lumbar spine was performed on April 14, 2010, which reflected disc desiccation at L5-S1 with minimal central and right paramedian disc protrusion but without significant stenosis or definite nerve root compression. Disc height and signal were maintained with no additional level of disease. Vertebral body stature and alignment and marrow remained normal and the distal cord and conus were unremarkable. (Tr. 583).

On April 15, 2010, plaintiff saw James T. Merenda, M.D., an orthopedic surgeon. Dr. Merenda did not recommend surgery at the L5-S1 because of the "paucity of findings" on the MRI results. Instead, he recommended weight reduction surgery and

---

[14] A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

epidural steroid injections. (Tr. 585). The following day plaintiff went to the Emergency Department at St. John's Mercy Medical complaining of back pain.  The attending physician noted that the MRI's reveal only a small disc herniation.

On April 19, 2010, plaintiff, for the first time, told Dr. Berry that the medications provided no relief. Dr. Berry increased her Percocet and planned for epidural steriod injections. (Tr. 612-613). These injections took place on April 20, 2010 and April 27, 2010. (Tr. 614-615, 617-619). Plaintiff stated that the first injection provided 50% relief. (Tr. 617-619).

### III.  The ALJ's Decision

In the decision issued on August 5, 2010, the ALJ made the following findings:

1.   Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012.

2.   Plaintiff has not engaged in substantial gainful activity since July 1, 2008, the amended alleged disability onset date.

3.   Plaintiff has the following severe impairments: osteoarthritis, obesity, and degenerative disc disease of the lumbar spine.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: must have sit, stand option at the work site with ability to change positions frequently; occasionally climb stairs and ramps; occasionally stoop, kneel, or crouch; never climb ladders, ropes or scaffolds; and never crawl.

6.   Plaintiff is unable to perform any past relevant work.

7.   Plaintiff was born on August 7, 1970 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.   Plaintiff has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.   Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from July 1, 2008, through the date of this decision.

(Tr. 12-23).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner

-18-

has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2.  "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."  Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002).  This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side

effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred by (1) failing to properly consider depression and pain disorder as severe medically determinable impairments; (2) failing to properly consider opinion evidence; and (3) failing to properly consider plaintiff's credibility. (Doc. #15).

### A. Severity of Plaintiff's Impairments

### (i) Depression

In her application for disability benefits, plaintiff alleged disability due to osteoarthritis, bulging disc lower back, intracranial hypertension, depression, double knee surgery, and stasis dermatitis. At Step 2 of the sequential evaluation, the ALJ determined plaintiff's depression to be nonsevere.

The Social Security regulations define a nonsevere impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. See 20 CFR §§ 404.1521(a), 416.921(a). Under the regulations, the ALJ must evaluate the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. § 404.1520a(c)(3). The regulations further provide that if the ALJ rates plaintiff's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe, unless the evidence indicates that there is more than a minimal limitation

in the plaintiff's ability to perform basic work activities. Partee v. Astrue, 638 F.3d 860 (8th Cir. 2011); 20 CFR § 404.1520a(d)(1).

Plaintiff asserts that the ALJ erred in finding that her depression was a nonsevere impairment. She relies on the report of non-treating physician, Dr. Moses-Nunley, who diagnosed her with major depressive disorder and "chronic maladjustment that manifests primarily as a mood disorder and is likely related to the onset, severity and course of her pain disorders." Plaintiff further relies on Dr. Berry's diagnosis of "adjustment disorder secondary to chronic pain" and Dr. Mallya's diagnosis of "depressive disorder with lack of interest and pain" and her opinion that plaintiff would have difficulty engaging in full-time employment "[d]ue to medical/physical illness and pain which causes increased depression with decreased motivation."

The Court finds that the ALJ's determination that plaintiff had not experienced any episodes of decompensation, that she was only mildly limited in her social functioning, and that she had no limitation in her daily activities or in maintaining concentration, persistence and pace is supported by substantial evidence in the record. (Tr. 13).

Although Dr. Mallya's July 10, 2008 report diagnosed plaintiff with depressive disorder and an anxious mood, plaintiff was also described as well groomed, euthymic, oriented, of average intellect, and possessive of logical, sequential speech, and good judgment. Plaintiff was given a GAF of 60, which is indicative of only moderate symptoms. Dr. Mallya's second report, written on September 24, 2009, maintained a diagnosis of depressive disorder along with the opinion that plaintiff's depression with low motivation would affect to the "full extent" her ability to engage in sustained full-time employment. However, despite this conclusory statement, Dr. Mallya rated

-22-

plaintiff's ability to follow work rules, relate to co-workers, maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations as *good*. She further rated plaintiff's ability to deal with  the public, use judgment, interact with supervisors, function independently, concentrate, and demonstrate reliability as *fair* and only felt that plaintiff would be poor at dealing with work stresses.

Dr. Moses-Nunley provided a psychological examination of plaintiff on January 28, 2010. Despite diagnosing plaintiff with major depressive disorder, she expressed her opinion that plaintiff would have the ability to interact appropriately with the public, supervisors, and co-workers with only moderate restrictions in responding appropriately to usual work situations and to changes in routine work setting. Plaintiff was given a GAF of 70, which is indicative of only mild symptoms. Further, there is also no evidence in the record that plaintiff had been hospitalized due to her psychiatric condition. In fact, plaintiff testified at the hearing that her depression was mostly controlled.

Considering the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision regarding the severity of plaintiff's depression. A court should not reverse a decision merely because substantial evidence would have also supported a contrary outcome, or because the court would have decided differently. <u>Wildman v. Astrue</u>, 596 F.3d 959, 964 (8th Cir. 2010).

### (ii) Pain Disorder

Plaintiff next argues that the ALJ erred by not considering "pain disorder" in his decision. However, plaintiff did not cite pain disorder as an impairment when applying

-23-

for Social Security benefits or when completing the accompanying forms. See Kirby v. Astrue, 500 F.3d 705, 708-709 (affirming ALJ's finding that claimant did not suffer significant impairment; initial disability form did not claim such impairment). Furthermore, although it is true that plaintiff was treated for pain, not one of her treating physicians diagnosed her with pain disorder. Pain disorder is "like that of a physical disorder, but no physical cause is found. The pain is thought to be due to psychological problems."[15] Here, the pain was diagnosed as a symptom of plaintiff's various physical medical conditions, which include osteoarthritis, fibromyalgia, lumbar degenerative disc disease, and lumbar radiculopathy.[16] Accordingly, the ALJ had no obligation to consider pain disorder at Step 2 of the sequential evaluation.

## B. Opinion Evidence

### (i) Dr. Mallya

Plaintiff contends that the ALJ did not give proper weight to the opinion of Dr. Mallya, her treating psychiatrist. Plaintiff further argues that the ALJ failed to give good reasons for why he accorded only "some weight" to Dr. Mallya's opinion.

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). The opinion of a treating source should be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c)(2). If an ALJ discredits a portion of a

---

[15] Pain Disorder, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001920/(last visited Dec. 3, 2012).

treating physician's opinion, the ALJ must give good reasons for doing so. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

In his decision, the ALJ wrote that the "[t]reatment notes from [Dr. Mallya] indicate [] claimant's depression has been fairly well-controlled with medications," that the September 24, 2009 medical source statement "indicated fair to good functioning in all areas except ability to interact with supervisors," and that "[t]he only depressive symptoms cited were lack of interest and chronic pain." The ALJ then accorded "[s]ome weight" to Dr. Mallya's opinion "due to the treating history, clinical findings, and reasoned bases for the decisions." (Tr. 18).

As to the September 24, 2009 medical source statement, the ALJ could properly give less than controlling weight to Dr. Mallya's opinion because it was conclusory. The assessment contained three sets of checklists (one of which Dr. Mallya did not complete), cited to no medical evidence, and provided little to no elaboration. "The checklist format, generality, and incompleteness of the assessments limit evidentiary value." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "A treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements. Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).

The court further finds that the ALJ did provide good reasons for according "some weight," instead of controlling weight, to Dr. Mallya's opinion. The opinion of a treating physician should be given great weight only if the opinion is based on sufficient medical or diagnostic data. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007); 20 C.F.R. § 404.1527(d)(3) (more weight will be given to an opinion when the physician provides relevant evidence, such as medical signs, in support of his opinion).

The record reflects that plaintiff saw Dr. Mallya a total of nine times from July 10, 2008 to October 22, 2009. Progress notes from plaintiff's first visit provide very little medical support for Dr. Mallya's diagnosis of "depressive disorder." The notes reflect plaintiff's own account of her medical, social, and family history along with a brief "mental status" checklist reflecting that plaintiff was well groomed, cooperative, had no issues with speech or flow of thought, had a euthymic but anxious mood, possessed good insight and judgment, was oriented and of average intellect, and not suicidal. See Tr. 396-398.

The remainder of Dr. Mallya's progress notes are extremely brief, mostly consist of incomplete sentences reflecting plaintiff's own report of her general mood, and provide little to no medical or diagnostic data. On August 7, 2008, Dr. Mallya wrote that plaintiff's "moods [were] fairly well stable;" on September 2, 2008 plaintiff "reported some improvement - feeling more relaxed;" on September 20, 2008 plaintiff was "feeling much better;" on January 8, 2009 plaintiff's "mood [was] stable;" on March 5, 2009 plaintiff stated that she had "been feeling quite well" on March 11, 2009 plaintiff's Cymbalta was increased due to her report of feeling more depressed; on August 27, 2009 plaintiff reported "some improvement with [the increased dose of] Cymbalta" and the dosage was again increased; and on October 11, 2009 plaintiff again stated she was "feeling somewhat better since [the second increase of] Cymbalta." See Tr. 519-523.

The Court agrees with the ALJ that the "treating history, clinical findings, and reasoned bases," or lack thereof, are sufficient reasons for according less weight to Dr. Mallya's opinions. See Barnes v. Astrue, 4:10CV1322 MLM (ED Mo. July 7, 2011)

-26-

(treatment notes that primarily reflect plaintiff's recitation of her problems and subjective symptoms are not required to hold great weight).

Also, contrary to plaintiff's assertion, the ALJ did not make his own independent medical findings. The ALJ's decision reflects that he considered the evidence of record, including Dr. Mallya's reports. That fact that the ALJ did not address every detail of Dr. Mallya's notes does not establish that he made his ow medical conclusions. Barnes v. Astrue, 4:10CV1322 MLM (ED Mo. July 7, 2011); See also Karlix v. Barnhart, F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports the overall conclusion.").

### (ii) Dr. Alan Morris

Dr. Alan Morris, a consultive examiner, saw plaintiff on one occasion on January 28, 2010 for an orthopedic evaluation as requested by the ALJ at the hearing. The ALJ gave "some weight" to Dr. Morris' opinion and "a portion of the limitations [were] included in the residual functional capacity assessment." Plaintiff argues that the ALJ erred in failing to "provide good reasons for ignoring much of the evidence in Dr. Morris' report." Plaintiff also takes issue with the ALJ's statement that Dr. Morris' opinion "appeared to rely heavily on the claimant's subjective complaints and reports of limitations."

It is well settled that the report of a consulting physician who has seen the claimant only once is of little significance by itself. See Browing v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); Turpin v. Bowen, 813 F.2d 165, 170 (8th Cir. 1987) ("The report of a consulting physician who examines a claimant once does not constitute 'substantial evidence' upon the record as a whole.'"). Further, to the extent the ALJ may not have explained why he did not credit all of Dr. Morris' findings, "a deficiency

-27-

in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency has no practical effect on the outcome of the case." Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999).

The court disagrees with plaintiff's contention that the ALJ "ignored much of the evidence" provided by Dr. Morris, including "that a cane was medically necessary for ambulation." The ALJ's decision extensively listed the vast majority of Dr. Morris' observations; such as plaintiff's broad based waddling gait, her lack of lumbar lordosis or scoliosis, her ability to walk on heels and toes with light support from the wall, her ability to tandem walk and squat 30 degrees bilateral knee flexion, her ability to get on and off the exam table without assistance, a lack of joint effusion, moderate crepitus, normal lumbar spine alignment, and a lack of muscle atrophy in her lower extremities. Further, Dr. Morris' statement that plaintiff medically requires a cane is not supported by the medical reports of plaintiff's treating physicians, and plaintiff admitted at the hearing that her use of a cane was by choice and not by physician instruction.

Additionally, the Court does not find problematic the ALJ's determination that Dr. Morris' medical source statement, which vastly limited plaintiff's work-related physical activities, "appeared to rely heavily on claimant's subjective complaints and reports of limitations." A review of the record reflects that Dr. Morris' opinions on plaintiff's extensive work limitations are fairly inconsistent with his own examination observations and those of plaintiff's pain management physician, Dr. Berry, who had never placed work-related or physical restrictions on plaintiff. "An ALJ is entitled to give less weight to a medical opinion when it is based largely on subjective complaints, rather than on objective medical evidence" or when the physician's notes are

-28-

inconsistent with the RFC assessment. Kirby v. Astrue, 500 F.3d 705 (8th Cir. 2007); Hacker v. Barnhart, F.3d 934, 937 (8th Cir. 2006).

### (iii) Suzanne Page

Plaintiff contends that it was reversible error for the ALJ to weigh the opinion of Suzanne Page, a lay person, as that of a medical consultant. "An ALJ may rely upon the opinion of a nontreating or consultative 'medical source,' but he may not give the same weight to the opinion of a nonmedical, or lay, state agency evaluator." Williams v. Astrue, 4:11CV57 AGF, 2012 U.S. Dist. LEXIS 37359 (E.D. Mo. Mar. 20, 2012).

The Commissioner acknowledges s in his brief that the ALJ erroneously treated the findings of fact made by Ms. Page as an opinion from a non-examining expert source when, in fact, she was a Disability Determination Services Counselor, not a medical consultant. However, the Commissioner argues that the ALJ's misstatement was a harmless error in that it did not affect the outcome of the ALJ's RFC assessment or the legitimacy of that assessment. See Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (error is harmless when it would not affect the ALJ's decision).

The ALJ's decision presented an exhaustive description of plaintiff's medical history in which he provided detailed summaries of physician treatment notes, diagnostic test results, and an RFC assessment from an orthopedic physician. The ALJ also evaluated the plaintiff's credibility before considering the opinion of the DDS counselor. See Ott v. Astrue, No. 4:10CV2036 CDP, 2012 U.S. Dist. LEXIS 49380, (E.D. Mo. April 9, 2012) ("[T]he ALJ supported his opinion with sufficient medical evidence and medical opinions for [the Court] to conclude that, even if the ALJ understood that the RFC assessment [] was completed by a non-physician, he would have reached the same result, and any error in attributing the assessment to that of

a physician does not warrant remand."). Because of the ALJ's extensive attention to the reports of plaintiff's treating physicians, the Court finds that sufficient medical evidence supports the determination of the plaintiff's RFC, despite the ALJ's error in mistakenly categorizing Ms. Page as a non-treating expert.

The Court also notes that the ALJ's conclusion about plaintiff's RFC was more restrictive than the one proposed by the DDS counselor. Ms. Page opined that plaintiff could frequently stoop and occasionally crawl, while the ALJ found that plaintiff could occasionally stoop and never crawl. See Shelton v. Astrue, 2012 U.S. Dist. LEXIS 25368 (W.D. Mo. Feb. 28, 2012) (harmless error when the ALJ's RFC assessment is more restrictive than the DDS counselor's proposal).

### (vi) Susan Colburn

Plaintiff contends that the ALJ did not accord adequate weight to the medical source statement completed by nurse practitioner Susan Colburn. The one-page form reflects that plaintiff's pain issues would limit her employment to seated work and require 30- to 40-minute rest periods. The ALJ gave "little weight" to her opinion because it was "not from an acceptable medical source."

The Social Security regulations provide that in order to establish an impairment, the evidence must come from an acceptable medical source, such as a licensed physician or psychologist. 20 CFR § 404.1513(a)(1),(2). However, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, No. 08-5025 KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009). The medical source statement completed by Ms. Coburn consists of nothing more than a diagnosis of "HTN, fibromyalgia, and joint pain;" that plaintiff "continues with chronic pain issues - sees

pain management physician - uncontrolled HTN - adjusted antihypertensives;" "seated work needed;" "rest 40-30 min rest periods;" and "pain issues would limit amount of seated time." Regardless of whether Ms. Colburn could be considered an acceptable medical source, the assessment itself is defunct of any narrative explanation for the conclusory statements regarding plaintiff's work limitations. As such, the ALJ did not err in giving little weight to the assessment.

### C. Plaintiff's Credibility

The plaintiff argues that the ALJ failed to properly determine her credibility by first not discussing the side effects from her medication, specifically drowsiness, and second by finding that plaintiff's allegations of pain were supported by "relatively weak medical evidence."

Evidence and severity of pain is subjective in nature and, as such, an ALJ is required to evaluate more than objective medical evidence in order to evaluate whether the alleged symptoms negatively affects the claimant's ability to work. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions." The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. "The ALJ is not required to discuss methodically

-31-

each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011).

Although the ALJ did consider plaintiff's medications and their effectiveness when making his credibility determination, plaintiff is correct in asserting that the ALJ did not specifically consider drowsiiness as one of her reported side effects. However, this side effect did not exist for a period of twelve consecutive months. <u>See</u> <u>Shell v. Astrue</u>, 4:11CV1201 MLM (ED Mo. May 15, 2012) (citing 20 CFR § 414.909) (medication side effects must be expected to last for a continuous period of at least 12 months to be considered disabling). The record reflects that plaintiff first complained of drowsiness as a side effect on September 26, 2008 to Dr. Berry. (Tr. 490-491). However, she did not report any side effects on February 27, 2009. (Tr. 494-495). On October 30, 2009, plaintiff again complained of drowsiness as a side effect but *denied it as a significant issue*. (Tr. 525-526). On February 22, 2010 and April 27, 2010 treatments notes from Dr. Berry did not reflect any complaints of medication side effects. Accordingly, the ALJ was under no obligation to consider the effect of daytime drowsiness in his RFC determination.

Furthermore, despite the ALJ's concern for the existence of "relatively weak medical evidence," he did not reject plaintiff's complaints solely because of this reason. The ALJ also took into account that plaintiff had reported engaging in physical activities, such as water aerobics and cycling; that treatment notes reflected improvement in her symptoms after treatment and physical therapy; and that plaintiff had made various inconsistent statements regarding her disability.

The record also reflects that the medical evidence was relative weak in supporting plaintiff's complaints of disabling pain. For instance, her treating physicians repeatedly encouraged her to exercise, Dr. Merenda did not recommend surgery due to the "paucity of findings on MRI" and instead recommended weight reduction and steroid injections; her physical therapists reported great improvement with her exercises; and Dr. Berry stated that her complaints of pain simply did not correlate with medical findings and that her medications were an effective form of treatment. (Tr. 299-300, 337, 371, 462, 585, 610-611).

A review of the ALJ's decision shows that the ALJ thoroughly considered plaintiff's subjective complaints on the basis of the entire record before him, properly considered the Polaski factors, and set out inconsistencies detracting from plaintiff's credibility. Accordingly, the Court finds no error in the ALJ's decision to discount plaintiff's subjective complaints.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #15] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

Carol E. Jackson

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 30th day of January, 2013.

-33-